**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number:  **16-02667-jw**

## ORDER ON DEBTOR'S OBJECTION TO CLAIM OF THE CITY OF COLUMBIA

The relief set forth on the following pages, for a total of 18 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**03/24/2017**



US Bankruptcy Judge
District of South Carolina

Entered: 03/24/2017

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE:<br><br>Gary Allen Washington,<br><br>Debtor(s). | C/A No. 16-02667-JW<br><br>Chapter 13<br><br>**ORDER ON DEBTOR'S OBJECTION TO CLAIM OF THE CITY OF COLUMBIA** |

This matter comes before the Court upon the Objection to Claim of the City of Columbia ("Objection to Claim") filed by Gary Allen Washington ("Debtor"). A reply to the Objection to Claim was filed by the City of Columbia ("City"), and a hearing was held on the matter. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(B). After considering the evidence presented and the submissions and arguments of counsel at the hearing, the Court makes the following Findings of Fact and Conclusions of Law.[1]

**FINDINGS OF FACT**

1.     On December 22, 2004, Carolina Procurement Institute, Inc. ("Carolina Procurement") signed and delivered a promissory note to the City in the amount of $200,000 ("Note"). To secure the Note, Carolina Procurement also executed on that date a mortgage to the City on certain real property better known as 1811 and 1815 Gervais Street ("Mortgage"). The Mortgage was apparently never recorded with the Register of Deeds for Richland County. No evidence was submitted that showed that Debtor signed the mortgage in his individual capacity.

---

[1]     To the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such; and vice versa.

1

2.      To further secure the Note, Debtor, along with Michele A. Washington

("Mrs. Washington"), executed an absolute guaranty of the amounts owed to the City under

the Note ("Guaranty"). The Guaranty is secured by certain personal property of Debtor and

Mrs. Washington.[2]

3.      On November 2, 2009, Debtor and Mrs. Washington filed a petition under

Chapter 11 of the Bankruptcy Code ("First Bankruptcy Case") (C/A No. 09-08248-dd).[3]

During the First Bankruptcy Case, the City filed a proof of claim based on the Guaranty

reflecting a secured claim in the amount of $197,925.60. Neither Debtor nor Mrs.

Washington objected to the claim.

4.      The First Bankruptcy Case was dismissed on September 24, 2010, prior to

the confirmation of a chapter 11 plan.

5.      On February 3, 2011, Debtor and Mrs. Washington filed a second petition

for relief under Chapter 11 of the Bankruptcy Code ("Second Bankruptcy Case") (11-

00625-dd).[4]

---

[2]      The Guaranty states that the following items secure the Guaranty:

> The balance of every deposit account, now or hereafter existing, of the undersigned with
> the City and any other claim of the undersigned against the City now or hereafter existing,
> and all money, instruments, securities, documents, chattel paper, credits, claims demand
> and any other property, rights, interest of the undersigned, now or hereafter existing, which
> at any time shall come into the possession or custody or under the control of the City or
> any of its agents, associates or correspondents, for any purpose and shall include the
> proceeds, products and accessions of and to any thereof.

No UCC Statements were submitted into evidence regarding the security listed in the Guaranty.

[3]      The First Bankruptcy Case was assigned to Judge Duncan.

[4]      The Second Bankruptcy Case was assigned to Judge Duncan.

2

6.      The City filed a proof of claim in the Second Bankruptcy Case, reflecting a general unsecured claim in the amount of $190,199.05 based on the Guaranty.[5]  Neither Debtor nor Mrs. Washington objected to the claim.

7.      On December 22, 2011, the Court entered an Order Confirming Debtor and Mrs. Washington's chapter 11 plan in the Second Bankruptcy Case ("Confirmed Chapter 11 Plan").  The Confirmed Chapter 11 Plan provided that allowed general unsecured claims, including the City's claim, would share *pro rata* in a payment of $1,000.00 per month for a period of 60 months. The Confirmed Chapter 11 Plan estimated that payments by Debtor and Mrs. Washington would provide a dividend of 15 cents for every dollar on each general unsecured claim. Pursuant to 11 U.S.C. § 350(a), the Court entered a Final Decree Closing Case in the Second Bankruptcy Case on July 17, 2012 but the plan still remains in effect.

8.      Pursuant to 11 U.S.C. § 1141(d)(5), Debtor and Mrs. Washington, as individual debtors in a chapter 11 case, would not receive a discharge upon confirmation; rather, the Court grants a discharge upon completion of all payment under the chapter 11 plan. The Order of Confirmation provided that the Second Bankruptcy Case could be reopened without payment of a fee if Debtor and Mrs. Washington file a notice of completion of plan payments and request for discharge or motion pursuant to 11 U.S.C. § 1141(d)(5) and SC LBR 4004-1. It does not appear that Debtor or Mrs. Washington have requested a discharge in the Second Bankruptcy Case.

---

[5]      It appears that at the time of the filing of the proof of claim in the Second Bankruptcy Case, the City determined its claim was unsecured, apparently recognizing that the Mortgage was not executed by Debtor or Ms. Washington in their individual capacities or recorded with the Register of Deeds for Richland County.

9.     In 2013, First Citizens Bank, on behalf of the City, issued an IRS 1099-C Cancellation of Debt tax form ("1099-C Form") to Carolina Procurement, which indicated that the amount of debt discharged was $157,911.29. The 1099-C Form also indicated that the reason that the City issued the form was because of "Bankruptcy."

10.    On December 2, 2013, Debtor and Mrs. Washington filed a Motion to Reopen Chapter 11 Case ("Motion to Reopen"). At the hearing on the Motion to Reopen, Debtor indicated that he was seeking to modify the Confirmed Chapter 11 Plan because he and Mrs. Washington were not able to meet the obligations in the plan due to a reduction in income.

11.    On December 19, 2013, the Court denied the Motion to Reopen finding that Debtor and Mrs. Washington failed to demonstrate a substantial and unexpected change of circumstances to warrant a modification of the Confirmed Chapter 11 Plan.

12.    On February 26, 2014, the City Council for the City held a meeting ("City Council Meeting") to discuss its loan with Carolina Procurement and Debtor's Guaranty. At the City Council Meeting, the attorney for the City and the Executive Director of the City's Office of Business Opportunities stated that portions of the amounts owed under the Note had been "written off" and that indications point towards the City "writing off" other amounts in the future.

13.    On October 3, 2014, Debtor, with Mrs. Washington, filed a third petition for relief under Chapter 11 of the Bankruptcy Code ("Third Bankruptcy Case") (C/A No. 14-05589).[6]

---

[6]     The Third Bankruptcy Case was assigned to Judge Duncan.

14.     In the Third Bankruptcy Case, the City filed a proof of claim on January 22, 2015, reflecting an unsecured claim in the amount of $182,276.53. Neither Debtor nor Mrs. Washington filed an objection to the claim.

15.     On December 29, 2015, the Court entered an Order Denying Confirmation of Chapter 11 Plan in the Third Bankruptcy Case because Debtor and Mrs. Washington could not meet the confirmation requirements of 11 U.S.C. § 1129, including that no impaired class of creditors voted in favor of the plan. Shortly thereafter on January 4, 2016, the Court entered an order dismissing the Third Bankruptcy Case.[7]

16.      On May 30, 2016, Debtor filed a petition for relief under chapter 13 of the Bankruptcy Code ("Chapter 13 Case").[8]

17.     On June 30, 2016, the Trustee filed an objection to confirmation and a motion to dismiss ("Trustee's Objection and Motion to Dismiss"), alleging that the Debtor's filing of the present case was not in good faith and caused unreasonable delay that prejudiced creditors.

18.     On July 21, 2016, the City filed a proof of claim in the Chapter 13 Case, stating that it has an unsecured claim in the amount of $182,276.53.[9]

---

[7]     After the entry of the dismissal order in the Third Bankruptcy Case, Debtor appealed several of the Court's orders in that case. On appeal, the U.S. District Court for the District of South Carolina affirmed the bankruptcy court's orders in the Third Bankruptcy Case. No appeal was taken from the District Court's order.

[8]     Debtor's filing of a chapter 13 case after the confirmation of an individual chapter 11 case is frequently called a "chapter 24" proceeding. While not common, there is no per se rule in the Bankruptcy Code against the filing of a Chapter 24 proceeding. See In re Lemus, 516 B.R. 333 (Bankr. E.D.Va. 2014) (permitting a chapter 13 case to proceed after the debtor defaulted on her chapter 11 plan payments); In McMahan, 481 B.R. 901 (Bankr. S.D. Tex. 2012) (dismissing a chapter 13 case after the debtor defaulted on his chapter 11 plan payments but noting that "unanticipated changed circumstances could justify a Chapter 24 petition"). As is the situation in this matter, Chapter 24 proceedings are generally brought by individual debtors who have not received their discharge in the chapter 11 case as they have not completed their payments under the chapter 11 plan.

[9]     The City's claim is listed as Claim Number 8 on the claims register.

19.     On September 23, 2016, in resolution of the Trustee's Objection and Motion to Dismiss, the Debtor and Trustee entered a consent order requiring that any future dismissal of Debtor's Chapter 13 Case would be with prejudice for one year as to any reorganization chapter.

20.     On September 24, 2016, Debtor filed the Objection to Claim, alleging that the underlying debt is cancelled and that it is stale and uncollectable under South Carolina's three-year statute of limitations.[10] The Objection to Claim also states that "Debtor takes further challenge to the validity of the alleged original debt and matters regard the validity are being in [sic] addressed in separate litigation. Debtor reserves [the] right to challenge the validity of the original debt in a separate action without the same being deemed res judicata in this Objection to Proof of Claim."[11]

21.     On October 12, 2016, the City filed a reply to the Objection to Claim alleging that the underlying debt was not cancelled or discharged and that the claim is secured by a mortgage and is subject to the twenty-year statute of limitations, which has not expired.

22.     On January 18, 2017, an Order Confirming Chapter 13 Plan was entered. No objections to the confirmation were filed by the City or any other creditor. Debtor's confirmed chapter 13 plan provides for general unsecured claims, apparently including the City's claim, in the following manner: "General unsecured claims shall be paid allowed

---

[10]     Subsequently, in the joint statement of dispute filed by the parties on November 30, 2016, Debtor asserted that the amount reflected in the City's proof of claim is incorrect.

[11]     Debtor did not present arguments or further elaborate on this ground in either the joint statement of dispute filed on November 30, 2016 or at the hearing on the Objection to Claim. Therefore, as this ground was not addressed at the hearing on the Objection to Claim, the Court will not consider this argument at this time.

claims *pro rata* by the trustee to the extent funds are available after payment of all other claims. The debtor does not propose to pay 100% of general unsecured claims."

23.     A hearing was held on the Objection to Claim, in which evidence was presented and testimony was taken from Debtor and Paul Featheringill ("Mr. Featheringill"), the Commercial Loan Officer for the City's Office of Business Opportunities.

## CONCLUSIONS OF LAW

Debtor asserts that the City's proof of claim should be disallowed because the City has cancelled the debt, and in the alternative, the debt is stale under South Carolina's three-year statute of limitations.[12] The City contends that the debt was not cancelled and is still collectable under the twenty-year statute of limitations.

When objecting to a proof of claim, the debtor has the initial burden of presenting evidence sufficient to overcome the *prima facie* presumption that a timely and properly filed proof of claim is valid. See In re Harford Sands, Inc., 372 F.3d 637, 640 (4th Cir. 2004). If sufficient evidence is presented to rebut the presumptive validity of the claim, the burden shifts to the creditor, who must prove the amount and validity of its claim by a preponderance of the evidence. See id.

### Cancellation of Debt

Debtor asserts that the City cancelled the debt based on the City's issuance of the Form 1099-C and the minutes of the City Council Meeting. Since the Guaranty provides

---

[12]     At the hearing, Debtor also alleged for the first time that the City's claim did not attach the appropriate supporting documentation, including the loan's payment history, which would allow Debtor to compute the present amount of the claim. The Court is unaware of any authority that would require a payment history to be attached to a proof of claim for an unsecured debt; nonetheless, as Debtor did not raise this argument in the Objection to Claim, the Court will not consider this argument by Debtor at this time.

that it should be construed according to the laws of the State of South Carolina, the Court

will apply South Carolina law to these issues. The cancellation of a guaranty is governed

by § 36-3-604 of the South Carolina Code, which provides:

> (a) A person entitled to enforce an instrument, with or without consideration, may discharge the obligation of a party to pay the instrument (i) by an intentional voluntary act, such as surrender of the instrument to the party, destruction, mutilation, or cancellation of the instrument, cancellation or striking out the party's signature, or the addition of words to the instrument indicating discharge, or (ii) by agreeing not to sue or otherwise renouncing rights against the party by a signed record.

S.C. Code Ann. § 36-3-604 (2017).

At the hearing, Debtor submitted into evidence the Form 1099-C issued by First

Citizens Bank on behalf of the City, which stated that $157,911.29 of the debt owed by

Carolina Procurement was discharged. South Carolina law has not addressed whether the

issuance of an IRS Form 1099-C is sufficient evidence that a debt has been discharged or

otherwise cancelled. The majority of courts that have addressed this issue, including the

Court of Appeals for the Fourth Circuit, have found that an IRS Form 1099-C alone is not

sufficient evidence that the debt has been cancelled. See, e.g., F.D.I.C. v. Cashion, 720

F.3d 169, 180 (4th Cir.  2013) ("[T]he mere fact that a Form 1099-C is filed does not

constitute sufficient evidence, standing alone, that a debt has been cancelled."); Owens v.

Commissioner, 67 Fed. App'x 253 (5th Cir. 2003) (stating that the issuance and filing of a

Form 1099-C does not constitute actual cancelation of the loan); Capital One, N.A. v.

Massey, C/A No. 4:10-CV-01707, 2011 WL 3299934 at *3 (S.D. Tex. Aug. 1, 2011)

("[T]his court adopts the view that a 1099-C does not discharge debtors from liability.");

In re Zilka, 407 B.R. 684, 689 (Bankr. W.D. Pa. 2009) ("Forms 1099-C, as a matter of law,

do not themselves operate to legally discharge debtor from liability on those claims

8

described in such Forms 1099-C."); but see In re Reed, 492 B.R. 261, 271–73 (finding in

the interest of justice and equity that a financial institution cancelled the debtor's debt as

evidenced by an IRS Form 1099-C); Franklin Credit Management Corp. v. Nicholas, 812

A.2d 51, 61 (Conn. App. 2002) (finding that the filing of an IRS Form 1099-C is *prima

facie* evidence that the debt has been discharged). In reaching this conclusion, the majority

of courts rely on the Internal Revenue Code, which provides that an IRS Form 1099-C

should be issued whether or not an actual discharge of the debt has occurred, as well as

IRS Information Letters, which indicate that the IRS does not view the filing of an IRS

Form 1099-C as an admission by a creditor that the debt is discharged and that the creditor

can no longer pursue collection. See, e.g., Cashion, 720 F.3d at 178–80. According to the

majority of court's reasoning, the IRS Form 1099-C is merely an IRS reporting document

and not *prima facie* evidence of a cancellation of debt. Id. at 179–80.  After considering

these analyses, this Court agrees with the majority of cases and believes under South

Carolina law, an IRS Form 1099-C would not be considered *prima facie* evidence that the

loan was cancelled. Rather, the Court should look to the entire record to determine if the

City cancelled the debt.

It appears clear that the Form 1099-C was issued as a result of the Debtor's

Confirmed Chapter 11 Plan in the Second Bankruptcy Case. Specifically, the Form 1099-

C states that it was being issued because of "Bankruptcy."[13] In addition, the amount listed

---

[13]    Section 1.6050P-1(b)(2)(A) of title 26 of the Code of Federal Regulations, which provides the
requirements regarding an IRS Form 1099-C, including the identifiable events that trigger the filing of the
form. The identifiable event selected by the City was "[a] discharge of indebtedness under title 11 of the
United States Code (bankruptcy) . . . ." 26 C.F.R. § 1.6050P-1(b)(2)(A) (2017). While many chapter 11
debtors receive a discharge upon confirmation of the chapter 11 plan, Debtor in the Second Bankruptcy Case
did not receive a discharge because individual chapter 11 debtors must generally complete all of their
payments under the plan prior to receiving a discharge. See 11 U.S.C. § 1141(d)(5) (2017). The City's
selection of bankruptcy as the identifiable event on the Form 1099-C suggests that the City issued the form
in error under the mistaken belief that Debtor had received a discharge in the Second Bankruptcy Case.

in the Form 1099-C reflects approximately 85% of the debt, the amount of the debt that

was not to be paid through the terms of the Confirmed Chapter 11 Plan.[14] This approach

was confirmed by the testimony of Mr. Featheringill who indicated that Form 1099-C was

issued only to comply with the IRS's reporting requirements resulting from the bankruptcy,

and that the City intended to continue collection efforts. Therefore, it appears the Form

1099-C was issued as a result of the Confirmed Chapter 11 Plan and not as a result of an

intentional decision by the City to cancel the debt.

Debtor also presented the minutes of the City Council Meeting as evidence of an

intent to cancel the debt. The minutes include several statements about "writing off"

Carolina Procurement's loan, including:

- "Mr. Kenneth E. Gaines, Esq., City Attorney [said] . . . My understanding from Mr. Runyan this morning is that the Washington's are delinquent in their payments under the bankruptcy plan and indications are that it will be written off by the loan committee."

- "Mr. Kenneth E. Gaines, Esq., City Attorney said that the Commercial Revolving Loan Fund has written off $157,911.29 on this loan."

- "Mr. Kenneth E. Gaines, Esq., City Attorney . . . said indications are that the Commercial Revolving Loan Fund Committee will be writing off the amounts being paid pursuant to the bankruptcy plan."

- "Ms. Tina Herbert, Executive Director of the Office of Business Opportunities said we have already written off the difference between the balance and what the Bankruptcy Court said we could get."

As previously noted, under the South Carolina Commercial Code, a cancelation of

an instrument requires either (1) a voluntary and intentional act to discharge the obligation

---

Further, the Court notes that the City did not select another identifiable event under the regulation that would suggest an intentional decision by the City to discontinue collection activity and discharge the indebtedness. See 26 C.F.R. § 1.6050P-1(b)(2)(A) (2017).

[14]    As stated above, the Confirmed Chapter 11 Plan included the City's claim in the class of general unsecured creditors. Under the plan, the general unsecured creditors would receive a *pro rata* share of monthly payments of $1,000 over five years or approximately 15% of the amount of the creditor's allowed claim.

or (2) a signed record agreeing not to sue the debtor or renouncing the creditor's rights against the debtor. The minutes do not indicate that the City has agreed not to sue Debtor or otherwise cancel the loan. Further, the minutes do not indicate that the City would stop collection of the debt against Debtor or renounce any rights the City has against Debtor. In fact, the minutes suggest that the City was considering further collection efforts against Debtor:

- "Ms. Tina Herbert, Executive Director of the Office of Business Opportunities said . . . Today there was also a motion to investigate whether or not we have the option of having the bankruptcy order dismissed and going back after them."

- "Mr. S. Allison Baker, Senior Assistant City Manager added that the decision has to be made on that is whether or not we lose more money by going after [Debtor] versus staying where we are now."

The City continued collection efforts after the City Council Meeting by filing a proof of claim in the Third Bankruptcy Case and the present Chapter 13 Case. This is further supported by Mr. Featheringill testimony that the City kept the debt on the City's books and considered it an active and collectable loan.

While the minutes to the City Council Meeting suggest that the City had "written off" the debt, based on the testimony of Mr. Featheringill, the term "written off" apparently reflects an internal accounting policy of the City and not a cancelation or discharge of Debtor's obligations.[15] See Zilka, 407 B.R. at 687 (holding that a charged off loan "is not the legal equivalent of forgiving a debt" (internal citations omitted)); Verdini v. First Nat.

---

[15]    Neither party has provided South Carolina case law that addresses the effect of an internal write off or charge off in the context of an alleged cancellation of debt. However, the Court notes that the Supreme Court of South Carolina, in addressing a state tax law issue, relied on the following definition of a charge-off: "To treat (an account receivable) as a loss or expense because payment is unlikely; to treat as bad debt." South Carolina Dep't of Revenue v. Anonymous Co. A, 401 S.C. 513, 516 n. 2, 678 S.E.2d 255, 257 n. 2 (2009) (quoting Black's Law Dictionary 227 (7th ed. 1999)). This definition supports the proposition that a "write off" or "charge off" is an internal accounting practice and does not have the legal effect of discharging a debtor from the underlying debt.

11

Bank of Pennsylvania, 135 A.3d 616, 620 (Pa. Super. Ct. 2016) (same); Kelly v. Wolpoff

& Abramson, L.L.P., 634 F.Supp.2d 1202, 1208–09 (D. Colo. 2008) (stating that a loan's

"'charging off' essentially amounts to a ledger book reclassification and is an accounting

practice" and finding that a charge off did not extinguish the debtor's liability); Discovery

Bank v. Worsham, 176 P.3d 366, 368 (Okla. Civ. App. 2007) (stating that an internal

charge off only reflects a creditor's accounting procedure); Mitchell Bank v. Schanke, 676

N.W.2d 849, 854 n. 7 (Wis. 2004) ("A 'write off' does not mean that the institution has

forgiven the debt or that the debt is not still owing."); Central Home Trust Co. of Elizabeth

v. Lippincott, 392 So.2d 931, 933 (Fla. Dist. Ct. App. 1980) ("The [charge off] process has

nothing to do with contacting the debtor and demanding the total debt be paid. It is strictly

a bookkeeping or accounting procedure within the bank or loan company.").

Further, no evidence was submitted that the Guaranty or related loan documents

have been delivered to Debtor as a discharge of the debt, or that these documents were

intentionally destroyed or marked as cancelled by the City.

Therefore, based on the evidence presented and for the foregoing reasons, the Court

finds that Debtor's obligations under the Guaranty were not cancelled or otherwise

discharged by the City as asserted herein by Debtor.

## **Statute of Limitations**

Debtor also alleges that the City's proof of claim should be disallowed because the

collection on the Guaranty is barred by South Carolina's three-year statute of limitations

for a breach of contract. The City contends that the statute of limitations has not expired

because its claim is subject to the twenty-year statute of limitations.

Section 15-3-520 of the South Carolina Code provides that "an action upon a bond or other contract in writing secured by a mortgage of real property [or] an action upon a sealed instrument" must be commenced within twenty years. S.C. Code Ann. § 15-3-520 (2017). However, "an action upon a contract, obligation, or liability, express or implied, excepting those provided for in Section 15-3-520[,]" must be brought within three years. Id. at § 15-3-530.

While the Note given by Carolina Procurement was secured by the Mortgage, the Guaranty was not secured by the Mortgage. Specifically, the Guaranty states that it is secured only by certain personal property of Debtor and Mrs. Washington. Therefore, it does not appear that the City's claim based on the Guaranty is secured by a mortgage.

In addition, the South Carolina Code provides that to be sealed, an actual seal does not need to be affixed; rather, it is sufficient for an instrument to be sealed if "it shall appear from the attestation clause or from any other part of any instrument in writing that it was the intention of the party or parties thereto that such instrument should be a sealed instrument . . . ." Id. at § 19-1-60. The District Court for the District of South Carolina recently summarized what is needed under South Carolina law to be a sealed instrument:

> Courts in South Carolina construe [§ 19-1-60] narrowly. Inclusion of standard attestation language, such as "IN WITNESS WHEREOF, the parties have hereunto set their hands and seals," is not enough to indicate the parties' intent to create a sealed instrument. Rather, courts will find an intent to create a sealed instrument only where the standard attestation language is accompanied by additional indicia.

Orlando Residence, Ltd. v. Hilton head Hotel Investors, 2013 WL 1103027 at *10 (D.S.C. Mar. 15, 2013) (internal citations omitted). This additional indicia includes language such as "SIGNED SEALED AND DELIVERED IN THE PRESENCE OF" or the notation of

13

"L.S." by the parties' signatures. See Carolina Marine Handling, Inc. v. Lasch, 363 S.C. 169, 172–76, 609 S.E.2d 548, 550–52 (Ct. App. 2005).

In the present case, the Guaranty includes standard attestation language, "IN WITNESS WHEREOF," but it does not include any additional indicia that the parties intended the document to be under seal. The term "sealed" is not included in the language of the Guaranty and the parties' signatures do not include the notation of "L.S." Therefore, the Guaranty was not executed under seal. See Orlando Residence, 2013 WL 1103027 at *11 (finding that instrument was not a sealed instrument when it included a standard attestation clause but no inclusion of additional indicia like "signed, sealed and delivered" or "L.S."); Lasch, 363 S.C. at 172, 609 S.E.2d at 550 (finding that a standard attestation clause was not sufficient to create a sealed instrument). For these reasons, it appears that the twenty-year statute of limitations does not apply, leaving the three-year statute of limitations as controlling.

Even applying the three year statute of limitation, Debtor has not satisfied his burden that the City's claim is barred. In asserting this affirmative defense, Debtor relies on the minutes of the City Council Meeting to indicate that the loan became delinquent in June of 2010, the alleged start of the limitations period,[16] and therefore, the three-year period had passed before the filing of this case.[17]

---

[16]    Under South Carolina law, the statute of limitations for an action based on the Guaranty would begin immediately upon a default on the Note. See Citizens and Southern Nat'l Bank of South Carolina v. Lanford, 313 S.C. 540, 543, 443 S.E.2d 549, 550 (1994) ("Under an absolute guaranty of payment, the creditor may maintain an action against the guarantor immediately upon default of the debtor.").

[17]    For the purposes of this Order, the Court will base its calculations of the statute of limitations on the alleged June 2010 default. However, Debtor did not address the effect of his payments to the City pursuant to the Confirmed Chapter 11 Plan on the statute of limitations under S.C. Code Ann. § 15-3-120. Mr. Featheringill testified that Debtor made payments on the debt pursuant to the Confirmed Chapter 11 Plan until October of 2013. Section 15-3-120 of the South Carolina Code provides:

However, Debtor's argument fails to take into consideration the tolling of the

statute of limitations as a result of Debtor's multiple bankruptcy cases.[18] The South

Carolina Code provides that when an injunction or statutory prohibition prevents a party

from commencing a lawsuit, the statute of limitations is tolled for the time period that the

injunction or prohibition is in effect. See S.C. Code Ann. § 15-3-100 (2017) ("When the

commencement of an action shall be stayed by injunction or statutory prohibition the time

of the continuance of the injunction or prohibition shall not be part of the time limited for

the commencement of the action."); Abdullah v. Reynolds, C/A No. 2:12-cv-3499-RMG,

2014 WL 851859 at *3 n. 5 (D.S.C. Mar. 4, 2014) ("[T]he statute of limitations is tolled in

South Carolina during the time that a litigant is statutorily barred from brining suit."). The

automatic stay under 11 U.S.C. § 362(a) in each bankruptcy case prohibited the City from

commencing an action against Debtor for the default on the loan, and therefore tolled the

statute of limitations of the claim. See Pettibone Corp. v. Easley, 935 F.2d 120, 121 (7th

Cir. 1991) (noting that some states toll the statute of limitations for the entirety of a

---

> "No acknowledgement or promise shall be sufficient evidence of a new or continuing
> contract whereby to take the case out of the operation of [the statute of limitations] unless
> it be contained in some writing signed by the party to be charged thereby. But payment of
> any part of principal or interest is equivalent to a promise in writing."

S.C. Code § 15-3-120 (2017). The Court could not find case law addressing the effect of a Chapter 11 plan payment on the revival of a claim's statute of limitations. In the context of a chapter 13 case, Courts have been reluctant to revive the statute of limitations upon a chapter 13 trustee payment because the payments are not "voluntary." See In re Seltzer, 529 B.R. 385, 389 (Bankr. M.D. Ga. 2015) ("'[P]ayments must be voluntary in order to reflect the debtor's acknowledgement of his obligation. For this reason, other courts have rejected the notion that payments made by trustees in bankruptcy qualify as partial payments reviving the statute of limitations.'" (quoting U.S. v. Lorince, 773 F.Supp. 1082, 1092 (N.D. Ill. 1991)). However, in the present circumstances, Debtor, as an individual, made the payments directly to the City after the bankruptcy estate had vested all of its property back to Debtor under 11 U.S.C. § 1141(b) upon confirmation, and at a time when Debtor no longer operated as a debtor-in-possession. Therefore, there is an argument that Debtor's payments made pursuant to the Confirmed Chapter 11 Plan were voluntary and restarted the statute of limitations.

[18]    The Court takes judicial notice of its records in the First Bankruptcy Case, Second Bankruptcy Case and Third Bankruptcy Case.

bankruptcy proceeding and citing to an Illinois state statute that is nearly identical to S.C.

Code Ann. § 15-3-100 as an example); In re Zinchiak, 406 F.3d 214, 227 (3rd Cir. 2005)

(concluding "that the automatic stay is precisely the type of 'statutory prohibition'

referenced in a [state's tolling statute]" and extending a limitations period by the time that

the automatic stay was in effect). Due to the tolling applicable to Debtor, it appears that the

City could commence an action based on a June 2010 default under the statute of

limitations no later than June 8, 2016.[19] As Debtor filed the present petition on May 30,

2016, the statute of limitations had not elapsed to bar a collection action by the City before

the filing of this Chapter 13 case.[20]  Under the specific circumstances of this case, where

the extension of the statute of limitation under S.C. Code Ann. § 15-3-100 will be less than

30 days, the limitations period based on a June 2010 default is extended pursuant to 11

---

[19]    In June of 2010, Debtor's First Bankruptcy Case was pending. The automatic stay in that case prevented the City from commencing an action against the Debtor and tolled the statute of limitations. As a result, the statute of limitations for an action accruing in June of 2010 did not begin to run until September 24, 2010, the date that the First Bankruptcy Case was dismissed and the automatic stay was terminated.  As a result of the First Bankruptcy Case, the statute of limitations on a June 2010 default was extended to September 24, 2013. Thereafter, Debtor filed the Second Bankruptcy Case on February 3, 2011, which further tolled the statute of limitations. The automatic stay in the Second Bankruptcy Case terminated on July 17, 2012, when the case was closed, and the statute of limitations was tolled for 530 days.  As a result of the Second Bankruptcy Case, the statute of limitation on a June 2010 default was further extended to March 8, 2015. On October 3, 2014, Debtor filed the Third Bankruptcy Case on, which further tolled the statute of limitations. The automatic stay terminated in the Third Bankruptcy Case upon the dismissal of that case on January 4, 2016. The statute of limitations was tolled for 458 days as a result of the Third Bankruptcy Case; and therefore, the statute of limitations was extended to June 8, 2016.

[20]    As stated above in footnote 9, in the joint statement of dispute filed by the parties, Debtor argued that "the amount reflected on the Proof of Claim is erroneous even if allowed." These arguments were not included in Debtor's Objection to Claim and therefore, need not be considered by the Court at this time. Nonetheless, Mr. Featheringill testified in this hearing that the amount owed on the Guaranty was $182,276.53 as well as how the City computed that amount. The Court finds Mr. Featheringill's testimony to be credible as to the amount of the City's claim in this case, and Debtor offered no contrary evidence. The Court further notes that in connection with the Chapter 11 plan and confirmation order in the Second Bankruptcy Case, Debtor recognized the City's claim as a general unsecured claim in the amount of $190,199.05, the amount listed in the proof of claim filed in that case. The claim was never objected to and deemed allowed, and that case has not been dismissed nor has its confirmation order been voided. According to the holdings in In re Varat Enters., Inc., 81 F.3d 1310 (4th Cir. 1996) and Covert v. LVNV Funding, LLC, 779 F.3d 242 (4th Cir. 2015), the confirmation of the Chapter 11 plan in the Second Bankruptcy Case is a final judgment on the merits and the claim cannot now be collaterally attacked.

16

U.S.C. § 108(c)(2) an additional 30 days after the termination or expiration of the automatic

stay in this case, neither of which has occurred.[21]

## **CONCLUSION**

For the foregoing reasons, the Court overrules Debtor's objection to the proof of

claim filed by the City and it is allowed as filed.

**AND IT IS SO ORDERED.**

Columbia, South Carolina
March 24, 2017

---

[21]      Section 108(c) of the Bankruptcy Code provides that a statute of limitations that has not expired prior to the filing of a petition will not expire until the **later** of: (1) the end of the statute of limitations period, including any suspension such as those permitted in S.C. Code Ann. § 15-3-100, or (2) 30 days after notice of the termination or expiration of the stay.

17